374

MURRAY v. CHICAGO, ST. P., M. & O. RY.
CO.

No. 4472.

Circuit Court of Appeals, Seventh Circuit.
June 11, 1931.

James F. Burns, of Chicago, Ill., for appellant.

Nelson Trottman and Nelson J. Wilcox, both of Chicago, Ill., William T. Faricy, of St. Paul, Minn., and I. C. Belden, of Chicago, Ill., for appellee.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

Appellant Murray was a coal broker at Chicago, doing business under the name of Murray Coal & Coke Company. He represented certain coal mines, and under date of July 8, 1921, entered into three contracts with appellee railway company for the sale to the latter of coal. The contracts are identical, except that they are for different quantities, being for 70,000, 35,000, and 65,000 tons, respectively, each terminating March 31, 1922, and specifying two kinds of coal, viz., "mine run" and "egg," at appellee's option, "mine run" at $2.70 and "egg" at $2.90 per ton. The contracts specified the mines to supply the coal, and provided that the appellee should "place orders for daily shipments of coal under this contract in as uniform daily amounts as practicable, due allowance being made for the accumulation of a reasonable amount of coal in stock by the Railway at times when the natural conditions make it advisable to accumulate such stock."

The practice was for appellee to send Murray weekly orders specifying the daily requirements for the week, which orders were transmitted by him to the mines, which thereupon shipped the coal to the points directed, notifying both Murray and appellee; and therefrom Murray rendered to appellee monthly invoices, upon receiving which appellee paid Murray.

It appears that during the last three months of the contracts there were shipped to appellee 34,000 tons of "mine run" and 27,589.31 tons of "egg"; but the written orders which appellee from time to time placed for all this coal specified "special mine run" coal, none of them specifying "egg." The invoices, however, which Murray sent appellee during that period specified "mine run" and "egg" in the above-indicated aggregates; but in each of these invoices the price stated for all the coal was $2.70 per ton, and it was at this price that appellee made its settlements with Murray.

The action was for the difference on the "egg" coal between the contract price of $2.90 per ton and the $2.70 per ton which appellee paid. The cause was heard by the court without a jury, and judgment was given for appellee.

Murray testified that just prior to the beginning of the last three-month period Seddon, who was appellee's purchasing agent, asked him to include in future shipments as much "egg" coal as was possible, and that it was because of this oral request of Seddon that the "egg" coal was thenceforth included. Seddon, testifying some seven years after the occurrence, when he was an old man and retired from his near half century of employment with appellee, said that some such conversation did take place, but he did not know whether any orders had ever been placed on such basis. While at first seeming to confirm Murray's version, he afterwards stated that on his own initiative he requested that "egg" coal be sent for one week as an experiment, and that he was not certain how it happened to be sent thereafter. From a reading of his testimony it does not appear to be definite or convincing.

It does not definitely appear how appellee came to employ the term "special mine run" in its orders. The contracts do not specify such grade. It was testified that it might indicate a modified "mine run" or a modified "egg." It is very possible that in the conversation between Murray and Seddon it was suggested that somewhat larger coal be supplied, short of the grade of "egg," and that thereafter the order specified "special mine run" while the mines called it "egg," and Murray charged it at $2.70.

Murray was not a producer of coal, but a seller, whose business was not so large but that it was conducted by himself and his stenographer; and yet it appears that for four years after the billing by him of the "egg" coal at $2.70 per ton, and payment therefor on that basis, he did not, as he testified, know of the supposed error, and became aware of it then only through an examination of his books by income tax agents of the government.

The fact that one in Murray's situation did not in all that time discover this error against him, involving over $5,000, was a circumstance tending to corroborate the conclusion that at the time of the transactions "egg" instead of "mine run" coal was sent for shippers' convenience, or that it was then mutually understood by the parties that the price should not be in excess of $2.70 for any of the coal. Such conclusion finds further corroboration in the testimony of witnesses to the effect that the grades were produced by screening the coal, and that in filling their orders the mines would frequently accumulate a larger supply of "egg" than was needed, and, in order to keep their mines running and shipments moving, would often supply "egg" upon orders for "mine run." This would tend to explain how it happened that, while no "egg" was specified in appellee's orders, "egg" was billed, but was priced and paid for as "mine run," which would tend to support appellee's contention that the supplying of the "egg" upon orders for "mine run" was for the convenience of the shippers of the coal.

The controversy involves facts only, and the District Court heard the contradictory evidence thereon—largely of witnesses testifying in open court. We are not at liberty to disturb the court's findings, and its judgment is affirmed.